## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. **CARI STAPP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIV-15-** 1306-D |
| | ) | |
| 1. **HOBBY LOBBY STORES, INC.,** | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Cari Stapp, and for her Complaint in the above-entitled

action, alleges and states as follows:

## PARTIES

1.      Plaintiff, Cari Stapp, is an adult female resident of Oklahoma County,

Oklahoma.

2.      Defendant Hobby Lobby Stores, Inc., is an entity doing business in Oklahoma

County, Oklahoma.

## JURISDICTION AND VENUE

3.      This is a cause of action arising out of Plaintiff's former employment with

Defendant based on claims of disability discrimination in violation of the Americans with

Disabilities Act ("ADA") and ADA Amendments Act ("ADAAA"), and (2) interference with

and retaliation for use of leave under the Family Medical Leave Act ("FMLA").

4.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C.

1

§1331.

5.       All of the actions complained of herein occurred in Oklahoma County, Oklahoma.  Defendant is doing business in such county and may be served in said county. Oklahoma County is located in the Western District of Oklahoma.  Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6.       Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about February 16, 2015.  Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated September 1, 2015 (received by Plaintiff by mail thereafter), and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7.       Plaintiff began her lengthy employment with Defendant on or about March 22, 1994 as an Order Puller in Defendant's Oklahoma City, Oklahoma Warehouse.  She was promoted to Senior Team Leader in or around 1996 and promoted to Co-Manager in or around 2004.  In or around July 2013, Plaintiff's job title was changed to Manager.  At that time, Plaintiff was assigned to Defendant's Warehouse Buildings 1, 2 and 5.

8.       During her employment, Plaintiff's job performance was at least satisfactory, if not excellent.  Plaintiff received good performance evaluations and received no written discipline during her employment.

9.       In or around 2010, Plaintiff was diagnosed with Rheumatoid Arthritis, Sjorgens

2

Syndrome and Lupus.  Due to these medical conditions, Plaintiff is a qualified individual with a disability within the meaning of the ADA and ADAAA in that she is disabled, has a record of disability, and/or was perceived as disabled.  Her disabilities substantially limit and/or limited her in one or more major life activities, including but not limited to walking, standing, moving and sleeping.  Her disabilities impact one or more of her internal bodily processes, including but not limited to normal neurological and musculoskeletal function.  However, at all times relevant hereto, she was able to perform the essential functions of her job with or without reasonable accommodations.

10.     Shortly after the aforementioned diagnoses, Plaintiff notified her supervisor, Vice President of Distribution Accounting Beth Gonzales, of her medical conditions.

11.     On or about December 20, 2011, Plaintiff was admitted to the hospital due to abdominal pain.  The following day, Plaintiff underwent an emergency appendectomy.  She was released from the hospital on or about December 22, 2011 and placed off work for approximately two (2) weeks.

12.     On or about December 22, 2011, Defendant's Human Resources Department provided Plaintiff with FMLA forms to complete.  However, Gonzales told Plaintiff she was needed back at work for inventory.  Therefore, Plaintiff returned to work a half-day on or about December 23, 2011 and returned to full duty on or about December 26, 2011, despite her doctor's orders.

13.     In or around Spring 2012, Ron Adkins was hired in a newly-created General

Manager position.  At that time, Plaintiff began directly reporting to Adkins.  And, Gonzales became Plaintiff's second-level supervisor.

14.     In or around June 2013, Adkins informed Plaintiff that her office was being relocated from the front of the warehouse to the back because additional space was needed for newly-promoted co-managers.  Plaintiff accepted this move, however, it required her to walk across a 750,000 sq. ft. facility to get to her office.  Due to her medical conditions, Plaintiff asked that she be allowed to use a cart to move around the warehouse.  Adkins told Plaintiff he would get back to her about this request.  However, Plaintiff was not notified of his decision thereafter.

15.     In or around July 2013, Plaintiff was off work approximately two (2) weeks due to numbness in her left leg rendering her unable to walk without falling.  She informed Adkins and Gonzales of the reason for her absence and applied for FMLA.  And, Plaintiff was notified by Human Resources Representative Annalee Miller that her FMLA request was granted.

16.     Plaintiff returned to work with the assistance of a walking cane.  Shortly after her return, she applied for intermittent FMLA leave through Miller and such request was granted.  Plaintiff's FMLA leave under this request included absences 1-2 days per week, as needed, for doctor's visits and days in which she could not work.

17.     Plaintiff discussed her intermittent leave and the reason for such leave with Adkins and Gonzales.  She also notified Adkins and/or Gonzales when she missed work for

4

FMLA leave.

18.     In or around March 2014, Plaintiff was notified by Adkins that Defendant may be asking her to undergo a medical review.  Adkins noted that on a couple of occasions, Plaintiff had used a walker to get to her office at the back of the warehouse.  According to Adkins, the medical review would be used to determine whether Plaintiff could perform the essential functions of her position.

19.     Around that same time, Human Resources Representative Kelly Dalrymple asked Plaintiff to provide her job description to HR.  Plaintiff told Dalrymple that the only job description she had was more applicable to a warehouse laborer than a manager.  Dalrymple said that Defendant was in the process of determining the different job functions for management and instructed Plaintiff to sign the job description after crossing through items that were not within Plaintiff's job functions.

20.     On or about March 24, 2014, Defendant sent a request to Plaintiff's doctor for documents related to her disabilities and accommodations Plaintiff may need to perform the essential functions of her job.  Plaintiff was told this was part of the medical review to determine whether Plaintiff's disabilities could be accommodated.

21.     However, the job description provided to Plaintiff's physician did not accurately reflect her job duties.  And, on or about March 31, 2014, Senior Vice President of Distribution Bill Woody told all managers (including Plaintiff) that they were required to sign the job description reflecting duties that did not differentiate between management and

non-management employees.  Woody stated that he was aware the job description outlined duties not applicable to management.

22.     On or about April 14, 2014, Plaintiff arrived at work using her walker.  That afternoon, Adkins sent her home on paid personal leave.  He told Plaintiff that she could not come to work if she had to use a walker or was dragging her leg.  Adkins stated that Plaintiff's medical review was pending and she would be advised when she could return to work.

23.     Thereafter, Adkins told Plaintiff to return to work on or about May 12, 2014 and work in an office in the front of the Warehouse if she could not walk to her office in the back of the Warehouse without a walker.

24.     On or about June 10, 2014, Plaintiff was notified that Defendant had concluded her medical review.  Plaintiff was told she was being assigned to Building 5 only, which did not have stairs.  She was further advised that she would only be permitted to use her walker when traveling from her car to the Warehouse and that she would be given a motorized cart to move around the warehouse.

25.     Adkins and Gonzales stated that, because Plaintiff was being removed from Buildings 1 and 2, two (2) recently hired males would become managers of Buildings 1 and 2.  As a result, one-third of Plaintiff's former job duties were split between the two (2) male managers, who were significantly younger than Plaintiff.  Later, Plaintiff discovered that the two (2) male managers were being paid very close to what Plaintiff was earning, although

they assumed only one-third of Plaintiff's job duties and had significantly less experience

than Plaintiff.  Plaintiff did not receive any increase in pay, although she was required to train

the two (2) male managers.

26.    On or about August 11, 2014, Plaintiff expressed concern about this pay

disparity to Adkins.  On or about August 15, 2014, Plaintiff was called to a meeting with

Adkins and Gonzales regarding her complaint.  Gonzales stated that the male managers' pay

was none of Plaintiff's business.  Plaintiff told Gonzales that she felt it was her concern

because she did not receive a raise to train them and that she had also trained Adkins for the

General Manager position with no additional pay.  Plaintiff also stated that she believed the

failure to increase her pay was due to her disabilities and use of FMLA.  In response,

Gonzales stated that she needed a full-time manager, and it was Plaintiff's choice whether

she came to work.

27.    Thereafter, Plaintiff experienced retaliation for her protected complaint.  For

instance, Adkins provided little to no assistance to Plaintiff in the operation of Building 5,

although he worked very closely with male warehouse managers.  Adkins' absence was so

evident that Plaintiff's subordinate employees asked why Adkins ignored Building 5.

28.    Moreover, Plaintiff tried to talk to Adkins about issues with operations in

Buildings 1 and 2 that were brought to her attention by employees.  Adkins repeatedly told

Plaintiff that the other Buildings were none of her concern.

29.    Due to Adkins' adverse treatment, Plaintiff contacted Miller in or around

October 2014 to request a transfer out of the warehouse.  Plaintiff told Miller she was being discriminated against and retaliated against due to her disabilities and use of FMLA.

30.    Over the next several months, Plaintiff had numerous discussions with Miller about the treatment she received from Adkins and Gonzales, stating that such treatment was motivated by her disabilities and FMLA use.  On such occasions, Miller encouraged Plaintiff to file for social security disability.  However, Plaintiff was performing her job satisfactorily (or better).  And, any difficulties in the performance of her duties was caused by Adkins' and Gonzales' treatment of her, not her disabilities.

31.    On or about December 18, 2014, Plaintiff requested a meeting with Adkins to address various reports she had received from her subordinate employees.  Specifically, the employees indicated Adkins was counseling employees while Plaintiff was out on intermittent FMLA.  She further expressed her concern that he offered little to no support while Plaintiff was at work, but counseled her employees while she was out of FMLA.

32.    During the meeting, Adkins suggested that his interference with Plaintiff's employees was because Plaintiff was "gone half the time."  Plaintiff asked Adkins whether he was holding against her the fact that she was on FMLA.  Adkins responded by referring Plaintiff to Human Resources with her complaint.  Plaintiff reported Adkins' statements to Miller and again requested that she be transferred out of the warehouse due to this discriminatory and retaliatory conduct.

33.    On or about February 2, 2015, Plaintiff was called to a meeting with Personnel

Manager Keith Watters and Miller.  Plaintiff was told Watters and Miller were conducting

an investigation. Watters then asked several questions regarding an employee shift change

that had occurred the prior month.

34.     During the meeting, Plaintiff told Watters that she had concerns about the way

she had been treated.  She pointed out that she had spoken with Miller several times about

her concerns and that Watters should speak with Miller about those complaints.

35.     The following day, on or about February 3, 2015, Plaintiff was informed by

Watters that she was terminated for creating a negative environment which was interfering

with the work performance of her fellow employees.  Plaintiff was on intermittent FMLA

leave at the time of her termination.

36.     Upon information and belief, Adkins and/or Gonzales were involved in the

decision to terminate Plaintiff's employment.  In fact, both were interviewed during Watters'

alleged "investigation."

37.     The termination reason was merely pretext.  And, any alleged employee

dissatisfaction was caused by the manner in which Adkins implemented the employee shift

change.  In or around October 2014, Adkins told Plaintiff to ask her subordinates whether

they wanted to change their shift start time from 5:00 a.m. to 8:00 a.m. or, in the alternative,

transfer to Building 1 or 2 and keep a 5:00 a.m. start time.  Plaintiff's employees stated they

did not wish to transfer, and Plaintiff communicated the same to Adkins.

38.     Thereafter, Adkins told Plaintiff that her employees would be transferred and

9

their shift start time changed regardless of the choice they had made.  Plaintiff advised

Adkins that the employees may react adversely to this forced change.  Adkins stated that was

Plaintiff's problem.

     39.    The transfers and shift change were scheduled to occur on or about January 1,

2015.  Therefore, the employees made personal arrangements, such as child care, in

accordance with their slated new shift start time.  However, the change was pushed back by

Adkins and Gonzales several times, until it was ultimately implemented on or about January

26, 2015.  As such, employees were upset regarding these inconsistencies and repeatedly

changing start times (and how these changes impacted child care, etc).

     40.    Upon information and belief, Plaintiff was replaced by a non-disabled male.

     41.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

the injuries described hereafter.

## COUNT I - ADA AND ADAAA

     For her first cause of action, Plaintiff incorporates all prior allegations and further

alleges and states as follows:

     42.    The matters alleged above constitute discrimination based on a disability, a

record of a disability and/or perceived disabilities in violation of the ADA and ADAAA.

     43.    More specifically, Plaintiff was a qualified individual with a disability in that

she suffers from physical impairments (i.e., rheumatoid arthritis, Sjorgens Syndrome and

lupus) which substantially limit her ability to perform one or more major life activities as set

forth above.  Further, Plaintiff's disabilities impact one or more of her internal bodily processes as shown herein.

44.     Despite said impairments, Plaintiff could perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

45.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

46.     Because the actions of Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT II - FMLA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

47.     The matters alleged above constitute interference with and retaliation for Plaintiff's use and/or attempted use of medical leave in violation of the Family Medical Leave Act.

48.     Plaintiff was entitled to medical leave because she required time off to care for herself due to a serious health condition (as set forth above) and worked for Defendant (i.e., entities with more than 50 employees within a 75 mile radius of Plaintiff's worksite), for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

49.     As shown above, Defendant interfered with Plaintiff's use of FMLA, including

but not limited to terminating her while she was on intermittent FMLA.  Further, Defendant retaliated against Plaintiff when she was terminated on FMLA and in close temporal proximity to her complaints of FMLA retaliation.

50.     As set forth herein, Defendant's actions were in willful violation of the law. Defendant was aware of the FMLA and the requirements contained therein, but willfully violated Plaintiff's FMLA rights.

51.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered injuries and is entitled to recovery of all damages, including, but not limited to, lost wages (past and future), liquidated damages (based on the willfulness of Defendant's violation of the FMLA), attorney fees and costs.

## **REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages, and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 24th DAY OF NOVEMBER, 2015.**

s/Jana B. Leonard
JANA B. LEONARD, OBA# 17844
LAUREN W. JOHNSTON, OBA #22341
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800        (telephone)
(405) 239-3801        (facsimile)
leonardjb@leonardlaw.net
johnstonlw@leonardlaw.net

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED